# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

BEVERLY LYN SNEED,                                )
           Plaintiff,                         )
                                      )
       v.                                       )        CAUSE NO.: 2:13-CV-279-PRC
                                        )
CAROLYN W. COLVIN, Acting Commissioner  )
of the Social Security Administration,          )
           Defendant.                        )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Beverly Lyn Sneed

on August 16, 2013, and a Plaintiff's Brief in Support of Reversing the Decision of the

Commissioner of Social Security [DE 19], filed on March 7, 2014. Plaintiff requests that the April

26, 2012 decision of the Administrative Law Judge denying her claims for disability insurance

benefits and supplemental security income be reversed and remanded for further proceedings. On

May 5, 2014, the Commissioner filed a response, and Plaintiff filed a reply on June 2, 2014. For the

following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff claims she is unable to work due to degenerative disc disease, stenosis, a cyst in her

back, neuropathy, osteoarthritis in her hands, sciatica, severe fibromyalgia, a bulging disc, problems

with her knees, and depression. On November 30, 2010, Plaintiff filed applications for disability

insurance benefits and supplemental security income based on cardiac failure, alleging an onset date

of November 19, 2010. The applications were denied initially on February 17, 2011, and upon

reconsideration on April 4, 2011. Plaintiff timely requested a hearing, which was held on April 12,

2012, before Administrative Law Judge ("ALJ") Henry Karmzyk. In appearance were Plaintiff, her

attorney, and a vocational expert. On April 26, 2012, the ALJ issued a written decision denying

benefits based on these findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2. The claimant has not engaged in substantial gainful activity since November 19, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia, bulging disc of the lumbar spine and narrowing of the disc of the cervical spine (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with exceptions. Specifically, the claimant is able to lift and/or carry 10 pounds occasionally and/or lesser weights frequently; stand and/or walk up to 2 hours in an 8-hour workday and sit up to 6 hours in an 8-hour workday. She is never to climb ladders, ropes or scaffold[sic], but may occasionally climb ramps and stairs, and may occasionally balance, stoop, crouch, kneel and crawl.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in 1978] and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR § 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (2 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 19, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 15-21).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On May 24, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski*

*v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no,

then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that the ALJ erred (1) in dismissing consideration of Plaintiff's mental limitations at step two; (2) by improperly assessing Plaintiff's hand limitations; (3) by not supporting the residual functional capacity finding with evidence of record; and (4) in the credibility determination.

### A. Mental Limitations

The ALJ made multiple errors in finding Plaintiff's mental limitations not severe. In reports filed with the state agency, Plaintiff listed problems with her memory, completing tasks, concentrating, understanding, and following instructions. On December 22, 2010, Joelle Larsen, Ph.D., completed a Psychiatric Review Technique form. Dr. Larsen noted that there were no records of psychological treatment and no medications for medical conditions of record. She wrote:

> According to clmt and 3rd party reports of functioning, limitations for activities such as doing chores, personal care, cooking, shopping and driving are limited due to physical problems. Clmt needs to write down doctor's appointments to remember them, and occasionally her kids will remind her to take her medications. Clmt reported 8th grade with special education, however she has a long work history of unskilled and semi-skilled work.

(AR 470). Dr. Larsen found Plaintiff's reports credible but concluded there was no medical evidence to establish a medically determinable mental impairment.

On March 29, 2011, Randall Horton, Psy.D., affirmed Dr. Larsen's opinion, having "reviewed all the evidence in file." (AR 481). However, it appears that Dr. Horton did not review mental health treatment records from Dr. Gupta at Porter-Starke Services that began on March 9, 2011, which are summarized below. These March records from Dr. Gupta have a facsimile stamp date of April 6, 2012, to Plaintiff's attorney, and the second treatment date on June 3, 2011, postdates Dr. Horton's opinion. Although the state agency did not date stamp its receipt of Dr. Gupta's records, all the records were submitted by Porter Starke with notes dated June 13, 2011, and marked by the state agency as Exhibit 11. Also, given Dr. Gupta's findings of marked and moderate limitations in several functional areas, it is unlikely Dr. Horton would have affirmed Dr. Larsen's opinion if he had read Dr. Gupta's records without any recognition of Dr. Gupta's findings.

On March 9, 2011, Plaintiff sought treatment at Porter-Starke Services from S. Gupta, M.D., for stress and mood instability, post-traumatic stress disorder ("PTSD") symptoms, and prolonged grief related to her brother's death. (AR 487). Her mood instability included anger outbursts, periods of depression, and periods of high irritability. Since the death of her brother two years earlier, her depressive symptoms had worsened and she had experienced nightmares and flashbacks of specific moments surrounding his death as well as a higher tendency to isolate and detach from others,

excessive crying, and feelings of guilt. Plaintiff also admitted some irrational thoughts. Additionally, she reported chronic pain with a desire to stay away from others and stay in bed.

Dr. Gupta noted a depressed mood as well as a depressed and tearful affect, and he diagnosed a mood disorder, not otherwise specified (NOS), associated with marked findings of worthlessness or guilt, distractibility, depressed mood, and anhedonia or reduced interest. Dr. Gupta diagnosed PTSD with marked findings of decreased concentration; avoidance of activities, places, or people; detachment from others; decreased interest or participation in activities; and recurrent distressing event recollection. Dr. Gupta also reported moderate findings of response to traumatic event of intense fear/helplessness, flashbacks, exposure to a traumatic event, psychological distress at cues that symbolize trauma, hypervigilance, and an exaggerated startle case response. Additionally, Dr. Gupta diagnosed social phobia with marked avoidance of associated situations, moderate fear of public social performance, and moderate changes in behavior related to panic attacks. Dr. Gupta also diagnosed prolonged bereavement. Dr. Gupta assessed Plaintiff's Global Assessment of Functioning (GAF) score as 50.

On June 3, 2011, Dr. Gupta noted Plaintiff's ongoing problems with mood swings, depression symptoms, chronic pain management issues, and irritability that had recently worsened. (AR 483). Plaintiff was overwhelmed, sad, cried easily, felt unmotivated, and was anxious and tense. She had some symptoms of PTSD with flashbacks and avoidance. Dr. Gupta noted that Plaintiff appeared in obvious pain and had some difficulties with her gait. Dr. Gupta diagnosed a bipolar disorder with the need to rule out PTSD and attention deficit/hyperactivity disorder. Dr. Gupta assessed her GAF score as 50 to 60, prescribed medication (Celexa and Trazodone), and recommended that Plaintiff continue to work with a therapist.

At the hearing, Plaintiff testified that she suffers from depression and had been in therapy, but that she stopped attending when her pain made leaving her house difficult.

At step two of the analysis, the ALJ reviewed Plaintiff's adult functioning report and noted that, although Plaintiff checked the boxes for difficulties with memory and concentration, handling stress and changes to routine, completing tasks, and understanding and following directions, the remainder of her report described physical problems. (AR 16). The ALJ noted Plaintiff's testimony that she gets along with her children and family and that she has a few friends. Then the ALJ noted that, since the alleged onset date, Plaintiff had only three months of therapy from March 2011 through June 2011 and that she has not treated since then. The ALJ concluded that the issues she expressed during therapy about being overwhelmed due to her medical and pain management issues and guilt due to the death of her brother appeared to be "only situational since she has not treated since June 2011, and have lasted less than 12 months in duration." *Id.* Thus, because her symptoms purportedly lasted less than twelve months, the ALJ found her mental impairment to be non-severe.

There is no record support for the conclusion that Plaintiff's psychiatric problems disappeared when she stopped going to therapy, nor does the ALJ cite any. *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995); *see also Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("This assessment is the result of a hunch and an ALJ may not rely on a hunch."). The ALJ offers no record-based explanation for how diagnosed bipolar disorder vanishes because a patient does not continue treatment. Moreover, Plaintiff testified that she stopped going because pain prevented her from leaving the house, which the ALJ did not mention. (AR 43). The ALJ erred by failing to consider and discuss Plaintiff's explanation for not continuing treatment. *See Shauger v. Astrue*, 675 F.3d 690, 969 (7th Cir. 2012); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft*

*v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (criticizing the ALJ for not questioning the claimant about the lack of treatment and for not discussing the evidence of record that suggested why the claimant had not received treatment).

Nor did the ALJ discuss Dr. Gupta's diagnoses, Dr. Gupta's assessment of marked and moderate limitations in many areas of functioning based on those diagnoses, the GAF scores assigned by Dr. Gupta, or that Dr. Gupta had prescribed medication to treat Plaintiff's mental impairments. The ALJ discussed only those portions of the record that support his finding that Plaintiff does not have a severe mental impairment. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence.'") (quoting *Clifford*, 227 F.3d at 871).

As noted above, Dr. Larsen reviewed the evidence and gave an opinion in December 2010, months before Plaintiff treated with Dr. Gupta, and Dr. Horton affirmed Dr. Larsen's opinion before Dr. Gupta's records were added to the record. Perhaps this is why the ALJ did not mention either opinion in his analysis of the Plaintiff's mental impairments. The ALJ would have benefitted from an updated expert opinion, a medical expert, or a psychological consultative examination. *See Richards v. Astrue*, 370 F. App'x 727, 730-31 (7th Cir. 2010) (citing *Villano v. Astrue*, 556 F.3d 558, 561 (7th Cir. 2009); *Young v. Barnhart*, 362 F.3d 995, 999 (7th Cir. 2004); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)).

Finally, Plaintiff argues that the ALJ erred by not following the "special technique" for evaluating mental impairments. The special technique, set forth in 20 C.F.R. §§ 404.1520a and 416.920a, is used at steps two and three of the evaluation process to determine whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. *Craft*, 539 F.3d at 674; SSR 96-8p, 1996 WL 374184 (July 2, 1996). First, the ALJ determines whether a claimant has a medically determinable mental impairment(s) by evaluating the claimant's "pertinent symptoms, signs, and laboratory findings." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a. The ALJ must document that finding of a medically determinable mental impairment and rate the degree of limitation in four broad "functional areas" known as the "B criteria": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013) (citing § 404.1520a(c)(3); *Craft,* 539 F.3d at 674 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq.* )). Each assigned rating corresponds with a determination of the severity of the mental impairment. *Id*. (citing § 404.1520a(d)(1)). The ALJ must document use of the technique, incorporating the relevant findings and conclusions into the written decision. *Pepper*, 712 F.3d at 365 (citing § 404.1520a(e)(4)). *Id.* The Seventh Circuit Court of Appeals has held that, "[u]nder some circumstances, the failure to explicitly use the special technique may . . . be harmless error." *Craft*, 539 F.3d at 675. But this is true only when the ALJ provides "enough information to support the 'not severe' finding," and those reasons are supported by medical evidence. *See Pepper,* 712 F.3d at 366 (internal quotation omitted). In this case, the Commissioner does not address the ALJ's failure to apply the special technique. Because of the errors set forth above, the failure to apply the special technique was not harmless error.

In the response brief, the Commissioner does not address any of Plaintiff's arguments. Rather, the Commissioner misapprehends Plaintiff to be arguing that the opinions of Dr. Larsen and Dr. Horton should be disregarded because they did not review Dr. Gupta's records. The Commissioner then argues, without evidence, that Dr. Horton reviewed the evidence on March 29, 2011, which was after Plaintiff first saw Dr. Gupta on March 11, 2011. Again, there is no indication in the record that Dr. Gupta's records were made a part of the record reviewed by Dr. Horton on March 29, 2011. Most importantly, the Commissioner mistakenly contends that the ALJ properly relied on the state agency reviewers' opinions, when the ALJ did not cite the opinions.

Remand is required for the ALJ to properly consider Plaintiff's depression.

## B. Hand Limitations

At step two, the ALJ found that Plaintiff's hand problems were non-severe because she had no treatment for her hands since her alleged onset date of November 19, 2010. The ALJ indicated that he considered both the severe and non-severe impairments when considering whether Plaintiff meets a listing and in assessing the RFC. However, the ALJ did not include any hand limitations in the RFC. Plaintiff argues that the ALJ's failure to discuss the records of her treating physician, her own testimony, her reports, and the reports of her mother that are consistent with hand limitations requires remand. The Commissioner responds that all the evidence Plaintiff cites in support of hand limitations pre-date her alleged disability onset date and, therefore, relate to the period of time covered by the prior ALJ decision dated November 8, 2010, which is final and binding on the parties.[1]

---

[1] That first decision did not find that Plaintiff had any severe hand impairment and did not include any hand limitations in the RFC, as the ALJ found that Plaintiff had the RFC to perform the full range of exertional requirements of sedentary work. (AR 124).

Plaintiff began treating with rheumatologist, V. Reddy, M.D., on October 12, 2009. (AR 343-44). At that time, she reported hand problems with cramping. (AR 343). On December 17, 2009, Dr. Reddy noted what appears to be hand cramping. (AR 340). On May 20, 2010, Dr. Reddy noted numbness in both hands and decreased grip strength. (AR 334). On September 17, 2010, Dr. Reddy wrote a letter that "a note which was handwritten from January of this year states that her hand findings are consistent with [degenerative joint disease] as I did find that her PIP joints were tender and also did have a bony swelling as well." (AR 413). At the hearing Plaintiff testified that she has osteoarthritis in her hands, that lifting a gallon of milk was painful, and that, although she could use her hands, she drops a lot of things and her hands would stiffen, "cramp up," and fall asleep. (AR 56). In her adult function report, Plaintiff indicated difficulties with manipulative activities like zipping and buttoning and that her hands cramp, making writing and other activities with her hands difficult.

The prior decision was issued on November 18, 2010, and the prior ALJ found that the record supported no ongoing complaints regarding her hands. (AR 126). The ALJ in that prior decision noted that the medical expert testified that, although Plaintiff complained of symptoms of tingling and numbness in her hands on May 20, 2010, there were no clinical findings to support those symptoms. However, the ALJ in that first decision did not consider Dr. Reddy's September 17, 2010 notation regarding degenerative joint disease in the hands as that record was not sent to the state agency until December 2, 2010, after the November 18, 2010 decision. (AR 410).

Nevertheless, the ALJ is correct that the medical records since the November 18, 2010 onset date show no treatment for Plaintiff's hands. In fact, the medical records do not report Plaintiff complaining of problems with her hands, and no physician observed or opined that Plaintiff had

*hand* weakness or difficulty with fine or gross manipulation. Plaintiff was seen on March 16, 2011, and June 6, 2011, but she did not complain of hand pain or numbness. On March 16, 2011, at North Shore Health Centers, she denied joint pain, stiffness, or swelling; muscle pain or cramps; and weakness of muscles or joints. (AR 517). On examination, her motor nerves were "symmetrical and intact," her reflexes were "within normal limits and symmetric in the upper extremities," and sensory examination of the upper extremities was "appropriate." *Id*. On June 6, 2011, Dr. Spence, who was evaluating Plaintiff for neck and back pain, noted 5/5 muscle strength in her upper extremities bilaterally. (AR 495). The only record potentially applicable is a November 18, 2011 urgent care treatment note when Plaintiff was seen for neck and back pain. On examination, Plaintiff was positive for numbness in the extremities but was negative for extremity weakness; she did not complain of hand pain. (A 514).

When discussing the RFC, the ALJ noted that Plaintiff's grip strength was normal and intact on December 8, 2010, when Plaintiff was seen at North Shore Health Centers for flank and back pain. (AR 19, 423). Upon examination, Plaintiff's motor strength was 5/5, her sensory examination of the upper extremities was appropriate, and her upper extremity reflexes were within normal limits and symmetrical. The consultative reviewer's January 27, 2011 Physical Residual Functional Capacity Assessment cited this December 8, 2010 examination in finding no manipulative limitations, and the ALJ relied upon this decision.

Nevertheless, the ALJ did not discuss the favorable evidence from Plaintiff's treating physician in the year leading up to her November 18, 2010 onset date, and especially the September 17, 2010 notation from Dr. Reddy that was not considered by the ALJ in the first decision. Although the November 18, 2010 decision is res judicata as to Plaintiff's disability prior to that date, the

14

evidence through the date of that decision, in combination with later evidence (which include the September 17, 2010 notation by Dr. Reddy since it was not considered on the first application), may be used to establish disability for a later time period. *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998). In addition, the Seventh Circuit Court of Appeals has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir.2012); *Myles*, 582 F.3d at 678; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). "The ALJ must confront the evidence that does not support [his] conclusion and explain why that evidence was rejected." *Id.* (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). On remand, the ALJ shall discuss all the favorable treatment records, including those that predate the November 18, 2010 decision, with special attention to the September 17, 2010 notation by Dr. Reddy.

## C. Residual Functional Capacity

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. *Young*, 362 F.3d at 1000; 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant

evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* In addition, she "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id.*

Plaintiff argues that the ALJ did not identify medical evidence that she could perform the assessed range of sedentary work with no climbing of ladders, scaffolds, or ropes; occasionally climbing ramps and stairs; and occasionally balancing, stooping, crouching, kneeling, and crawling. She notes that the ALJ did not rely on any physician opinion. This is because the state agency consultative reviewer found that Plaintiff could do *more* than the ALJ found supported by the record, as the reviewer found that Plaintiff could perform light work with postural limitations. The ALJ explicitly found that Plaintiff "is more limited" based on the evidence of record. (AR 19). Plaintiff faults the ALJ for not obtaining evidence to fill this "void" by not asking for a review based on the expanded record or not having a medical expert at the hearing. However, the RFC determination is reserved to the ALJ as fact-finder for the Commissioner and need not be based on a specific medical opinion. In this case, in giving only little weight to these opinions and in finding instead that Plaintiff has an RFC for a limited range of sedentary work, the ALJ thoroughly discussed the

medical evidence of record, beginning with the examination records in December 2010 through March 2012.

Plaintiff specifically argues that the ALJ did not offer any explanation for finding that Plaintiff could occasionally (up to one-third of the work day) balance, stoop, crouch, kneel, and crawl. Plaintiff is incorrect. After considering the medical evidence and conducting a credibility determination, the ALJ formulated the RFC by starting with the RFC for sedentary work from the November 18, 2010 decision:

> Therefore, the undersigned agrees with ALJ Kramer's prior decision that the claimant would be capable of performing sedentary exertional work, but finds that since there was some evidence of an antalgic gait during a few examinations prior to her epidural injections, the claimant is never to climb ladders, ropes or scaffold[sic], but may occasionally climb ramps and stairs, and may occasionally balance, stoop, crouch, kneel, and crawl.

(AR 21). Plaintiff fails to acknowledge that the ALJ based these limitations on evidence of her antalgic gait. Plaintiff does not identify any medical records subsequent to the November 18, 2010 decision showing that she is more limited in these exertional areas than found by the ALJ. Thus, there is no evidentiary void.

Plaintiff also argues that the ALJ failed to assess her need to change positions frequently, her excessive tiredness, and her need to rest throughout the day. The Commissioner offers no response. Because this case is being remanded on other grounds, the ALJ is directed to discuss these limitations in the RFC determination.

### D. Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the symptoms affect her daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a). Subjective allegations of disabling symptoms alone cannot

support a finding of disability. *Id*. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)  The individual's daily activities;
(2)  Location, duration, frequency, and intensity of pain or other symptoms;
(3)  Precipitating and aggravating factors;
(4)  Type, dosage, effectiveness, and side effects of any medication;
(5)  Treatment, other than medication, for relief of pain or other symptoms;
(6)  Other measures taken to relieve pain or other symptoms;
(7)  Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain [her] credibility finding by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367 (citing *Terry*, 580 F.3d at 477).

The ALJ found Plaintiff's testimony and allegations to be disproportionate to the objective findings in the record and that the record does not establish that her symptoms preclude her from working all together. First, the ALJ discussed Plaintiff's activities of daily living. Then he found that her alleged deterioration since her last application for benefits was inconsistent with the medical records, which the ALJ found "essentially routine in nature." (AR 20). The ALJ noted that Plaintiff failed to follow through with physical therapy and that her examination findings returned to normal after receiving epidural injections. He commented that no physician imposed functional limitations. He also relied on the fact that no treating physician recommended a more aggressive treatment protocol, "such as surgery." (AR 21).

First, Plaintiff argues that the ALJ erred by focusing on his own interpretation of the medical findings as not supporting greater restrictions and that the ALJ discounted Plaintiff's credibility solely based on the medical evidence. As to the latter, the ALJ's credibility determination properly discussed many factors, including but not limited to the objective evidence. As to the former, Plaintiff gives two examples of how the ALJ misunderstood the medical evidence, which are related to her fibromylgia and her gait.

Plaintiff argues in one sentence that her fibromyalgia is not measured by objective findings cited by the ALJ such as an MRI, citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). But, the ALJ did not discount Plaintiff's credibility as to pain and limitations caused by her fibromyalgia based on MRI findings. Unlike in *Sarchet*, in which the ALJ fundamentally misunderstood the disease, the ALJ acknowledged the diagnosis of fibromyalgia in his recitation of her medical history. Indeed, in October 2009, Plaintiff had fourteen tender points spread over her back, hips, and neck, (AR 343), in March 2010, Dr. Reddy found sixteen tender points on examination, (AR 336), and in May 2010, Plaintiff exhibited eleven tender points on examination by Dr. Reddy. The ALJ then remarked in the credibility determination that "she has received only minimal treatment, which was essentially routine in nature." (AR 20). Plaintiff has not identified anything but routine treatment for her fibromyalgia. The ALJ did not err in his characterization of the record.

Plaintiff next criticizes the ALJ, in one sentence, for finding that epidural injections adequately addressed Plaintiff's gait problems without record evidence in support. However, the ALJ properly recounted the medical evidence of record. The ALJ noted that in February 2012, "examinations showed that she had normal range of motion, muscle strength and stability in all extremities, with no pain on inspection" and that "[h]er gait was also noted as normal in March

2012." On March 12, 2012, Plaintiff presented at North Shore Health Centers for a wellness exam. She reported having an epidural injection in the neck the previous week and that she was still in pain with cervical and lumbar stenosis. Upon review of systems, Plaintiff reported back and neck pain and numbness in the extremities but denied joint pain, joint swelling, and muscle weakness. On examination, she had normal range of motion, muscle strength, and stability in all extremities with no pain on inspection, and her gait was normal. However, generalized focal muscle tenderness was noted. In the RFC determination, the ALJ correctly noted that "her examination findings returned to a normal level of functioning after receiving epidural injections." (AR 20). Also, in finding Plaintiff more limited than the ALJ in the prior determination had found her to be, the ALJ noted that "since there was some evidence of an antalgic gait during a few examinations prior to her epidural injections, the claimant is never to climb ladders, ropes or scaffold[sic], but may occasionally climb ramps and stairs, and may occasionally balance, stoop, crouch, kneel and crawl." (AR 21). This is an accurate statement of the medical records. Notably, Plaintiff does not explain how the additional functional limitations assessed by the ALJ do not accommodate her limitations that are supported by the record.

In addition to criticizing the ALJ for relying on the objective evidence, Plaintiff also faults him for relying on his perception that Plaintiff's course of treatment was inconsistent with disability. The ALJ reasoned that "the claimant's treating physicians never recommended a more aggressive treatment protocol, such as surgery and thus, her impairments are not as severe as she alleges." (AR 21). Plaintiff argues that this is speculation about what would be considered appropriate treatment without support in the record. Although Plaintiff is correct that surgery is not a treatment for fibromyalgia, she fails to recognize that it can be a treatment for a bulging disc of the lumbar spine

and narrowing of the disc of the cervical spine, the other severe impairments from which Plaintiff suffers.

Plaintiff argues that the ALJ should have provided "support from the record for his speculation that more aggressive treatment such as surgery would have been suggested based on [Plaintiff's] reported symptoms." (Pl. Br. 23). This is nonsensical; if the medical records do not support greater limitations than those Plaintiff has reported to the agency, why would doctors recommend greater treatment? Such reasoning puts the ALJ in a catch-22. *See Love v. Colvin*, No. 12cv7141, 2014 WL 2037158, at *6 (N.D. Ill. May 16, 2014). Unlike in *Myles* and other cases in which an ALJ "played doctor," Plaintiff has not shown that the ALJ ignored relevant medical evidence, substituted his view for that of a physician, or made a determination best left to a medical expert. *See Myles*, 582 F.3d at 677; *Love*, 2014 WL 2037158, at *6. Rather, the ALJ made an observation based on the absence of treatment in the record, and "treatment" is one of the credibility factors the ALJ must consider. The burden of demonstrating disability remains with Plaintiff through step four of the analysis. Thus, the argument that the ALJ "played doctor" fails. *See Pepper*, 712 F.3d at 367; *see also Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000) ("The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition."). Moreover, this is one factor among many relied on by the ALJ. Although Plaintiff points to her lack of financial resources as a possible explanation for not having more aggressive treatment, the argument is a red herring. Unlike in *Myles*, cited by Plaintiff, the ALJ in this case did not fault Plaintiff for failing to follow a recommended course of treatment. *See* 582 F.3d at 677. Rather, there is no indication in the record

that any doctor recommended more aggressive treatment and that Plaintiff was unable to follow the recommended course for financial reasons.

Plaintiff next criticizes the ALJ for writing: "Additionally, no treating or examining physician has found the claimant to be disabled or even limited to an extent greater than that outlined in her RFC. Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of greater restrictions placed on the claimant by a treating doctor, yet a review of the record reveals no such restrictions." (AR 20). Plaintiff argues that it would be nonsensical for a physician to have opined on her functional limitations when Plaintiff was out of work. *See Eskew v. Astrue*, 462 F. App'x 613, 616 (7th Cir. 2011) ("The absence of major *work restrictions* in Eskew's medical records does not illuminate the question of her credibility–she was after all unemployed throughout the time in question."); *compare Binion v. Shalala*, 13 F.3d 243, 248 (7th Cir. 1994) ("None of the treating physicians opined that Binion was disabled or had any limitations on her ability to do work-related activities."). In this instance, it is unclear whether the ALJ's reference to "restrictions" applies only in the context of a work environment or whether he meant restrictions that a doctor would order in the normal course of treatment unrelated to work. On remand, the ALJ shall clarify this analysis.

Plaintiff argues generally that the ALJ relied on perceived inconsistencies in Plaintiff's activities but did not explain how the reports were inconsistent. Plaintiff contends that the problem is compounded because the ALJ relied on a summary set forth in the prior ALJ's decision rather than the actual reports. However, it is unclear which part of the decision Plaintiff is criticizing. In analyzing activities of daily living, the ALJ identifies specific portions of the current and past records to compare.

Finally, Plaintiff contends that the ALJ did not consider the factors set forth in SSR 96-7p by not considering the state agency's reviewing experts' opinions that Plaintiff's reports were credible and by not considering Plaintiff's prescription for Vicodin. On remand, the ALJ shall consider each of these factors to conduct a more thorough credibility determination.

Plaintiff also argues that the ALJ did not assess the report from Plaintiff's mother. However, the ALJ acknowledged that he considered her report pursuant to SSR 06-3p, specifically noting that the mother "confirmed the statements in a Third Party Function Report." (AR 18). There is no technical error, and Plaintiff offers no specific analysis of her mother's statement or how the ALJ should have weighed it differently.

Overall, the Court cannot say that the credibility determination was patently wrong. However, because this matter is being remanded on other bases, the ALJ will have the opportunity to clarify and strengthen the credibility determination as set forth above.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 19], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 7th day of October, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record